# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 98-20834
Summary Calendar

_____

GREGORY KNIGHTS,

Plaintiff-Appellant,

VERSUS

BANK UNITED OF TEXAS FEDERAL SAVINGS BANK;
DENNIS LAIRD; C.J. ANCIRA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-97-CV-0669)

_____

August 13, 1999

Before JOLLY, SMITH, and WIENER,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Gregory Knights appeals a judgment, following a jury verdict, denying him recovery in his race discrimination and retaliation lawsuit against Bank United of Texas, Dennis Laird, and C.J. Ancira (collectively "Bank United"). Finding no error, we affirm.

### I.

Knights, a black male, worked as a branch manager for San Jacinto Savings from 1988 to 1991. After United Savings acquired San Jacinto Savings in 1991, Knights continued in his position. In May 1992, United Savings (now called Bank United) appointed Knights manager of its Greens Road branch, where he worked until he was terminated in February 1996. He never received any disciplinary measures or any other negative marks related to his employment before February 1996. Bank United terminated him, however, following a specific incident.

### A.

On February 28, 1996, a substitute vault custodian at the Greens Road branch, Helen Jackson, told Knights that there was a $5,000 discrepancy in the vault balance recorded on February 27. The vault balance on any given day should equal the cash in the vault plus the cash delivered to the central vault. The February 27 "vault ticket," however, showed that the vault teller on duty that day, Tami Cruse, had placed $1,293 in a bag to ship to the central vault. According to Jackson, the February 27 vault ticket did not account for $5,000 in cash.

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Knights called Cruse, who was off work on February 28, and asked how much money she had shipped to the central vault on February 27. Cruse responded that she had shipped $6,293, including $5,000 in $100 bills and $1,293 in mutilated bills. Knights then tried to contact the central vault to have them confirm that the shipment contained $6,293. Unfortunately, the central vault had not yet received the shipment and could not verify Cruse's recollection.

Based on Cruse's statement, Knights instructed Jackson to change the February 27 vault ticket to show that $6,293 had been shipped. Knights signed the altered ticket as "manager" and, with permission from Cruse, signed Cruse's name on the space for "teller signature." The next day, the central vault reported that the $6,293 had been properly accounted for and that there was no loss or discrepancy.

Bank United's area manager, Dennis Laird, directed Bank United's head of corporate security to investigate. In a written report, the security officer concluded that Knights had "force balanced" the February 27 vault cash drawer. Force balancing occurs when someone manipulates or causes something to balance by adding or subtracting money. The report confirmed that there was no loss, no criminal intent, and no intent to falsify bank records to conceal a loss and that Knights understood the importance of not engaging in forced balancing.

On request from Vickie Bargas, the human resources director, the operations department confirmed the security officer's conclusion that Knights's action constituted forced balancing. Based on this conclusion, Laird, Bargas, and Ancira (another senior human resources executive) recommended that Bank United terminate Knights's employment. This recommendation was made to Ron Coben, Bank United's regional manager, who held the ultimate authority to terminate.

After making their recommendation, Laird and Ancira met with Knights to hear his account of the relevant events. Ancira testified that she and Laird were willing to reconsider their recommendation if Knights offered some explanation or information that they did not know. Knights was not able to satisfy their concerns, however. In particular, Cruse's telephone assurances did not provide sufficient verification to alter the vault ticket.

Laird and Ancira offered Knights the option to resign or be terminated. Knights requested probation and asked that his good years of service be given consideration. Laird, however, told Knights that Bank United no longer trusted him. Given the option of termination or resignation, Knights tendered his resignation.

B.

Knights sued Bank United, Laird, and Ancira in state court, alleging race discrimination and retaliation under title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, race discrimination and retaliation under the Texas Labor Code §§ 21.051 and 21.055; and state law causes of action for slander, defamation, and intentional infliction of emotional distress. Defendants removed to federal court.

Knights alleged that his termination was motivated by racial animus and discrimination. He argued that the "forced balancing" incident was a pretext and, had he not been black, he would have been allowed to keep his job. He pointed out that since Bank United took over United Savings in 1991, all the black branch managers in the Houston area had left and had been replaced by whites. He argued that white employees and branch managers, who had been guilty of more serious infractions of bank policy, had been permitted to keep their jobs. He also asserted that Bank United terminated him in retaliation for his involvement in a race discrimination lawsuit against Bank United by another terminated black employee.

The court granted summary judgment to all defendants on Knights's retaliation and state law claims and to Laird and Ancira on Knights's race discrimination claims under title VII, 42 U.S.C. § 1981, and the Texas Labor Code. It denied summary judgment on race discrimination claims, however, for defendant Bank United.

The parties went to trial on the race discrimination claims, with Bank United as the only defendant. The jury returned a unanimous verdict for Bank United, and the district court entered a final judgment dismissing the lawsuit against all of the defendants.

## II.

Knights claims the court committed reversible error (1) by refusing to instruct the jury that he was constructively discharged; (2) by refusing to admit evidence about other alleged racial discrimination at Bank United; and (3) by granting summary judgment on his retaliation claims. We consider each in turn.

## A.

Knights argues that the court should have instructed the jury that, a matter of law, Bank United's "resign or be terminated" demand is a constructive discharge.[1] The jury question asked, "Do you find from a preponderance of the evidence that Bank United intentionally discriminated against Gregory Knights because of his race by *discharging him* from his employment?" (Emphasis added.) Without an instruction explaining that being asked to resign or be terminated is equivalent to a discharge, Knights claims that the jury felt obligated to side with Bank United if it mistakenly believed that Knights's resignation was not the same as a discharge. We find no error.

---

[1] Bank United claims that Knights failed to preserve this objection under FED. R. CIV. P. 51, because Knights did not supply a proposed written instruction and failed to obtain a ruling from the court on Bank United's proposed instruction. Knights replies that he *did* submit a proposed written instruction on constructive discharge in the joint pretrial order. Further, he explains that the words "Defendant contest" in bold type on the submitted instruction signify that the defendants objected to its admission.

We agree with Knights that it is hard to see how Bank United can claim ignorance of this proposed jury instruction on constructive discharge when it specifically objected to its admission. Further, Knights is also correct that the lack of a written instruction "is not necessarily fatal to appellate review . . . so long as the trial court was sufficiently advised of this instruction request." 9 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 51.11[1][b] (3d ed. 1999); *Bender v. Brumley*, 1 F.3d 271, 276 (5th Cir. 1993) ("We recognize that error is preserved for appeal so long as the complaining party states his assertion to the trial court prior to the time when the court invites on-the-record objections to the charge.").

Finally, we reject Bank United's claim that Knights failed obtain a ruling from the court to preserve its objection. The court *did* issue a ruling at the charge conference when it stated, in response to Knights's questioning, that there was no factual dispute on whether a termination occurred.

### 1.

We give district courts wide latitude in drafting jury instructions, and we ignore technical imperfections. *Bender*, 1 F.3d at 276. On the other hand, "at a minimum the court's instructions must give the jury adequate guidance to intelligently determine the questions presented." 9 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 51.10[1] (3d ed. 1999). We conduct a two-step inquiry when reviewing a jury instruction. First, we consider whether the charge "as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 464 F.2d 285, 290 (5th Cir. 1972). Then, even if we determine that an error has occurred, "[w]e will not reverse if we find, based upon the record, that the challenged instruction could not have affected the outcome of the case." *Middleton v. Harris Press & Shear*, *Inc.*, 796 F.2d 747, 749 (5th Cir. 1986) (internal quotations omitted).

### 2.

The court refused to give an instruction on constructive discharge, because it found there was no dispute as to whether Knights was fired or whether he resigned. Ron Coben, the Bank United official who held the decisionmaking authority for Knights's termination, testified that he decided to terminate Knights. The court relied on Coben's undisputed testimony to hold that "there is not a disputed issue as to whether his decision to leave Bank United was voluntary or not."

Knights points to a number of statements and documents implying that he resigned voluntarily. For instance, at opening argument, Bank United's counsel stated that "Bank United had a valid non-discriminatory reason for asking Mr. Knights to resign . . . ." Other documents described how Knights was given the opportunity to resign or be terminated.

We do not agree that these statements seriously misled the jury into believing that Knights resigned voluntarily. In addition to Coben's unequivocal testimony, Knights testified that "they forced me out. I mean, it's an ultimatum. That's what it is. 'You resign or we're going to fire you.' So, I got fired."

Bank United did not argue to the jury that Knights had voluntarily resigned or that the jury should base its decision on whether he had voluntarily resigned. Therefore, Knights's attack on the jury instruction falls far short of creating the "substantial and ineradicable doubt" necessary for reversal.

### B.

Knights proffered evidence of what he alleged was an atmosphere of discrimination against blacks at Bank United. Specifically, he offered evidence that Bank United adopted a discriminatory policy toward its customers and refused to change this policy despite complaints by its employees. After considering this proffered evidence in a hearing outside of the jury's presence, the court excluded Knights's evidence under FED. R. EVID. 401 for lack of relevance and FED. R. EVID. 403 for potential prejudice and confusion.

We afford district courts great latitude when determining the admissibility of evidence, and we review such decisions only for abuse of discretion. *Kelly v. Boeing Petroleum Servs.*, *Inc.*, 61 F.3d 350, 356 (5th Cir. 1995). Additionally, an evidentiary ruling will not be the basis for a reversal unless it is erroneous and substantial prejudice results. *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1220 (5th Cir. 1995). The party who offers the evidence has the burden of showing that substantial prejudice results from its exclusion. *Id.*

Knights appeals the exclusion of his evidence that Bank United treated Nigerian customers differently from other classes of customers. According to testimony by Knights and his colleague Helen Jackson, Bank United's security chief Richard Carr announced separate procedures to screen customers of Nigerian background when opening new accounts. Knights testified that he strongly disagreed with this policy, because

it treated Nigerians differently from other customers.

After considering evidence of this policy, as well as other proffered evidence of an atmosphere of discrimination, the court excluded Knights's evidence under rules 401 and 403, explaining that (1) there was no evidence that the alleged Nigerian screening policy was a procedure of the decisionmaker who terminated Knights; and (2) the alleged policy involved discrimination on the basis of national origin and is not the same kind of discrimination alleged by Knights.

In *Kelly*, this court faced a similar challenge to a decision to exclude evidence about an alleged atmosphere of discrimination. The *Kelly* plaintiff sued his employer for discriminating on the basis of his disability and then offered evidence about his supervisor's insensitive actions against minority and disadvantaged groups as well as against the disabled. The district court excluded *in limine* any evidence about discrimination against non-disabled minority groups, and we affirmed.

> Unlike cases in which the proffered evidence related to the same kind of discrimination and in which bigoted superiors directly made or participated in the employment decisions complained of, the court's ruling regarding anecdotal incidents of unrelated kinds of prejudice cannot be labeled an abuse of discretion when considered within the framework of this case.

*Kelly*, 61 F.3d at 358. We find this reasoning equally applicable in this case.[2] Knights did

not offer any evidence that the screening policy toward Nigerians was in actuality a policy designed to screen all customers of African descent. Therefore, the court was correct when it excluded this evidence as irrelevant concluding that the alleged screening policy "is discrimination on the basis of national origin, [and not] discrimination on the basis of race."

Further, the court relied on its authority under rule 403 to exclude even relevant evidence if it has a tendency to confuse, mislead, inflame, or waste the time of the jury. The court conducted a balancing analysis between the weak probative value of evidence of the alleged screening policy and the confusion such evidence would cause by creating a new line of inquiry in the trial. The court reasoned that Bank United would have to explain its policies for dealing with fraud in opening new accounts and measures it used in dealing with such problems to defend itself against Knights's allegations. We find these considerations persuasive, and we therefore refuse to see the district court's alternative basis for exclusion under rule 403 as an abuse of discretion.

Finally, even if we assumed, *arguendo*, that the evidence was relevant and that its probative value was not substantially outweighed by its potential for unfair prejudice, Knights has not shown how the exclusion of this evidence affected his substantial rights. The evidence strongly supported the jury's finding that Knights was terminated as a result of the "forced balancing" incident. Knights's proffered evidence would have focused the jury's attention on statements by Carr, a non-decisionmaker, regarding a request that did not involve employment decisions, and that at best showed a different kind of discrimination. Unlike evidence that Bank United would have disciplined a non-black employee differently for the same errors

---

[2] Knights directs our attention to *Polanco v. City of Austin*, 78 F.3d 968, 969 (5th Cir. 1996), for the proposition that evidence of a hostile atmosphere is probative in termination cases. We do not disagree with this general statement but reject its applicability to this case. *Polanco* involved a review of the sufficiency of the evidence for a jury determination and not a trial court's evidentiary ruling. Additionally, the evidence of a
(continued...)

(...continued)
hostile atmosphere in *Polanco* involved the same group (Hispanics) alleging discriminatory employment treatment.

committed by Knights, the proffered evidence could not overcome the substantial evidence that Bank United terminated Knights for a legitimate, non-discriminatory reason.

### C.

Knights attacks the summary judgment for Bank United on his claim of retaliation. Specifically, he argues that he raised a factual issue sufficient to defeat summary judgment on whether Bank United terminated him because of his participation in an unrelated race discrimination lawsuit ("the Spearman lawsuit") against the bank.

### 1.

When a district court grants summary judgment, we review the determination *de novo*, employing the same standards as did the district court. *See Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 205 (5th Cir.), *cert. denied*, 119 S.Ct. 509 (1998). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also* FED. R. CIV. P. 56(c).

### 2.

To establish a *prima facie* case of unlawful retaliation, Knights had to establish that (1) he engaged in activity protected by title VII, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse action. *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996). The district court assumed that Knights's name appearing in the Spearman lawsuit is a protected activity and that his termination was an adverse employment action. To survive summary judgment, however, Knights also had to raise a fact issue as to a causal connection between his involvement in the Spearman lawsuit and his termination.

The court based its summary judgment on two grounds. First, it observed that there is no evidence that Coben, the ultimate decisionmaker on Knights's employment, knew of Knights's involvement in the Spearman suit. In fact, Coben swore in his affidavit that he did not have any such knowledge.

Second, the court reasoned that even if, as Knight claims, circumstantial evidence showed that Laird and Ancira knew of Knights's involvement in the suit, this evidence alone cannot create a fact issue on whether Knights's name appearing in the suit was causally linked to his termination.

Knights is correct when he argues that Cobden's lack of knowledge about Knights's protected activity does not resolve the issue of whether there was a causal connection. This court will not require a direct causal connection between termination and the decisionmaker in a discrimination lawsuit where the decisionmaker follows a recommendation by someone who does have a causal connection.[3]

Knights is less persuasive, however, when he argues that as long as he can show that Laird and Ancira probably had *knowledge* of his involvement in the Spearman lawsuit, he has raised a fact issue as to whether racial animus played a role in their recommendation to terminate him. To establish a genuine fact issue necessary to avoid summary judgment on this causal link, it is true that Knights "need not prove that [his] protected activity was the sole factor motivating the employer's challenged decision . . . ." *Long*, 8 F.3d at 305 n.4. Still, this court has required more than mere knowledge of protected activity on the part of supervisors to find a fact issue.

---

[3] *See Equal Employment Opportunity Comm'n v. Manville Sales Corp.*, 27 F.3d 1089, 1092 (5th Cir. 1994) (admitting evidence of supervisor's discriminatory remarks even though supervisor did not make employment decision); *Long,* 88 F.3d at 307 (remanding summary judgment when employees established causal link between protected activity and immediate supervisors' recommendations for termination).

In *Long,* the court found that plaintiffs asserting a title VII retaliation claim had raised a fact issue on the causal link between their protected activities and their terminations when (1) the plaintiffs had filed complaints directly against their supervisors; (2) the supervisors had knowledge of these complaints; and (3) the supervisors recommended terminating the plaintiffs after learning of the complaints. *Id.* at 306. Knights, however, has provided only weak circumstantial evidence that Laird and Ancira knew that his name had been listed in the Spearman lawsuit. He provides no evidence that they knew that he had taken any action to aid Spearman. In fact, Knights did not take, and never did take, any action that aided the Spearman lawsuit. Therefore, while it is possible Laird and Ancira knew that Knights had been named in the Spearman lawsuit as a possible witness, there is no evidence that they had any knowledge that he had participated in any meaningful way in the suit.

In *Long*, the plaintiffs offered affidavits swearing that action was taken against them immediately after they filed their complaints. In contrast, Knights has offered no timeline or evidence establishing that Laird or Ancira acted as a result of his involvement in the Spearman lawsuit.

It is certainly true that Knights need not establish that his minimal participation in the Spearman lawsuit was the "but-for" factor motivating his termination. *See Long*, 88 F.3d at 305 n.4. Knights, however, has failed to raise provide even a "scintilla" of evidence that Laird and Ancira knew of his involvement or that they acted in any way as a result of his being named in the suit. Mere knowledge of possible protected activity is not enough to raise a fact issue on the necessary causal link for a retaliation claim.

AFFIRMED.

7